# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHWESTERN DIVISION

| | |
|---|---|
| GARLAND A. WHITE, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Civil Action |
| | ) No. 10-5064-CV-SW-JCE-SSA |
| MICHAEL J. ASTRUE, | ) |
| COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) |
| Defendant. | ) |

## ORDER

This case involves the appeal of a final decision of the Secretary denying plaintiff's application for supplemental security income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq., and his application for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401 et seq. Pursuant to 42 U.S.C. §§ 1383(c)(3) and 405(g), this Court may review the final decisions of the Secretary. Pending before the Court at this time are plaintiff's brief, and defendant's reply brief in support of the administrative decision. For the reasons stated herein, it will be ordered that the decision of the Administrative Law Judge ["ALJ"] be reversed.

### Standard of Review

Judicial review of disability determination is limited to whether there is substantial evidence in the record as a whole to support the Secretary's decision. 42 U.S.C. § 405(g); e.g., Rappoport v. Sullivan, 942 F.2d 1320, 1322 (8th Cir. 1991). Substantial evidence is "'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. V. NLRB, 305 U.S. 197, 229 (1938)). Thus, if it is possible to draw two inconsistent positions from the evidence and one

position represents the Agency's findings, the Court must affirm the decision. Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).

In hearings arising out of an application for benefits, the claimant has the initial burden of establishing the existence of a disability as defined by 42 U.S.C. §§ 423(d)(1). Wiseman v. Sullivan, 905 F.2d 1153, 1156 (8th Cir. 1990). In order to meet this burden, the claimant must show a medically determinable physical or mental impairment that will last for at least twelve months, an inability to engage in substantial gainful activity, and that this inability results from the impairment. Id. A disabling impairment is one which precludes engaging "in any substantial gainful activity [for at least twelve months] by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A finding of "not disabled" will be made if a claimant does not "have any impairment or combination of impairments which significantly limit [the claimant's] physical or mental ability to do basic work activities. . . ." 20 C.F.R. § 404.1520.

The standard by which the ALJ must examine the plaintiff's subjective complaints of pain is well-settled. The ALJ must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as the claimant's daily activities, the duration and frequency of pain, precipitating and aggravating factors, dosage and effects of medication, and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

## Discussion

Plaintiff was 48 years old at the time of the hearing before the ALJ. He alleges that he is unable to work because of back pain from a failed back surgery. Plaintiff has a high school education. He has past relevant work as a dispatcher, delivery driver, parts puller, automobile

detailer, and stocker.

At the hearing before the ALJ, plaintiff testified that, regarding his past relevant work, there was a period from 2001 through 2005 when he had no earnings because that was when he had his back surgery. He tried to work as an overnight stocker in a grocery store in 2006, but could not perform that job. He also had another full-time job for a short period of time, which involved janitorial work. He could not perform any of the work assigned to him at that job. Plaintiff testified that he injured his back in 2000 or 2001, which led to back surgery in 2001. He had previously had a neck fusion in 1996. It was his testimony that he still had problems from the back surgery. He has numbness in his back and has a sciatic nerve problem that runs down his right hip to his knee. He has to sit on one buttock or the other in order to try to sit comfortably in a chair. He gets migraines almost every day from his neck problem. Plaintiff testified that he has problems sleeping at night due to cramping. He has been prescribed muscle relaxers, but they don't seem to help that much. His back surgery was ultimately not successful. There was a time when he started feeling better after the surgery, when his pain level was about an eight on a ten-point scale, but now it is back to a nine. There was a settlement in 2005, and from then until approximately 2007 or 2008, when he got back on Medicaid, he relied on Advil for pain. Dr. Watermeier, the surgeon who took over for his original surgeon, Dr. Manale, suggested another type of surgery that would require some type of a mesh cage with hinges. Plaintiff stated that he did not want to go through another 18 months of sitting and recuperating from surgery. He testified that he was told that if he didn't have the surgery, the back fusion was not going to get any better. But, there was a possibility that the surgery might not make his pain any better, and might cause more stiffness and a lot more pain than he has now. Regarding the pain in his neck, plaintiff testified that the pain goes down into his shoulders and to his elbows.

He has nerve damage from the neck fusion, and has bone spurs in both elbows. The surgery on his back involved his low back, and he has pain down his right left to behind the knee. If he walks more than 10 to 15 minutes, he has leg pain, and the muscle in his knee and leg will start to pop out, like he is having muscle spasms. His back pain is constant numbness, which feels like little pins. Other than pain medications that he has taken or currently takes, he takes hot showers and tries to soak in the tub. He has to lie down constantly during the day because of pain. He would estimate that during an eight-hour period, he would spend at least half the day lying down, off and on. He will spend about 20 minutes doing something, and then need to lie down, which he described as actually being like a half sit. He can't sit straight up for long or sit flat, but he has to be leaning on one side or the other. It has been like this since his surgery. This takes the pressure off the bone. Plaintiff was observed sitting at the hearing in a leaning fashion. He has pain from a nerve if he sits flat for too long. He was allowed to get up for a minute at the hearing because of pain and discomfort from sitting too long. He testified that he can sit the way he was at the hearing for 15 minutes or so, with 30 minutes being the longest period of time before he wants to stand up. He can stand and move around for no more than 10 to 15 minutes before he needs to sit down. When he goes to the grocery store, he can't stay for more than 10 or 15 minutes before he has to go sit in the car. Regarding walking, he thought he could walk about the length of a football field. The doctor he is now seeing said he should try to get out and exercise as much as he can, so he tries to walk to his mailbox and back, but he starts hurting about half way back to the house. Sometimes, after he walks he doesn't feel like going again, but usually, after he lies down and takes a two-hour nap, then he can get up. When he wakes up in the morning, it takes him about three hours just to get moving. "It just literally feels like I'm being cut in half." [Tr. 34]. This is from all the pain. Regarding lifting, he has been told not to

lift anything over ten pounds.  He has problems even with a gallon of milk.  Plaintiff testified that he cannot bend from the waist, and when he squats, he loses his balance.  He has never fallen when walking, but he has come close.  He has to hold onto a railing to go up and down stairs.  He walks like he is afraid, although he does not use a cane.  He has problems with uneven surfaces and inclined surfaces; both of these cause him to have more of the burning and pin-like pain in his low back.  Plaintiff also testified that he has some numbness in his left hand, ever since he had his neck surgery; he has a little tingling in his right hand.  He cannot hold big things where he has to open his hands completely.  If he has to lift his arms over his head longer than a minute or two, he gets a burning, tired feeling.  He had a lot of problems at a job that required overhead reaching.  He did not think he could do that even on an occasional basis.  When asked why he did not file for benefits in 2002 or 2003 after the failed back surgery, plaintiff stated that "I never really wanted to think that I would be in this position.  I really thought that I would be able to go back to work and carry [sic] a normal life." [Tr. 37].  He stated that was why he tried working again in 2006.

     During a normal day, he might try to wash dishes if there aren't too many.  He doesn't attempt sweeping, mopping, and other things like that.  Even with the dishes, he doesn't complete the whole job at once; he might wash them and leave them for someone else to dry.  He tries to help around the house, but his pace is very slow, and he needs to stop and lie down.  When he tried to work in 2006, he could not keep up with the pace.  Plaintiff testified that he used to play in a computer league, but he can't do that anymore because he cannot sit long enough.  He occasionally will get on the computer, but not for long because it hurts to sit.  He used to drive to a doctor's appointment in Louisiana when he lived in Florida, but he had to stop at the rest areas, about every 20 miles. The nine-hour drive would take about 11 hours.  He only

did this twice before his ex-wife had to start driving him. Plaintiff testified that he probably drives about five miles a week. He did not drive to the hearing, which was about a 40-minute drive. He was able to make it without stopping, but he was in the back seat, half lying down. If the drive is longer than 15 or 20 minutes, or maybe five miles, he has to sit in the back. He goes grocery shopping with his wife, but can never finish the shopping. He carries the lighter things into the house. Plaintiff testified that he used to sleep well, but in the past seven months, his sleep has gotten worse. He has leg cramps that cause him to get out of bed. He's always had leg cramps, for which he's taken muscle relaxers. But, his current doctor is trying to get him off addictive medication, so he's no longer taking Soma for the cramping. The most sleep he has gotten since his surgery, up until seven months ago, is five hours straight through; then he would be awakened by pain, and would have to take a pain pill and muscle relaxer. After that, he would get a few more hours of sleep. He does not feel rested when he gets up in the morning. During the day, he sits around, watches a little television, has a cigarette outside, and when his pain gets worse, takes medication and lies down. His pain has affected his sexual drive. He is also not able to concentrate very long when he tries to do anything because he can't focus due to the pain. He feels like a burden when he goes anywhere, so he just basically would rather not go. He doesn't go to church or any organizations or meetings.

  The ALJ found that plaintiff had not engaged in substantial gainful activity since February 1, 2001, the alleged onset date. It was his finding that plaintiff has the severe impairments of "degenerative disc disease of the cervical and lumbar spine status post failed fusion surgery." [Tr. 11]. He concluded that plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment. After testimony from a vocational expert, the ALJ concluded that plaintiff could perform his past relevant work as a

dispatcher.  The ALJ found that plaintiff had the Residual Functional Capacity ["RFC"] to perform sedentary work as defined in the regulations, but "needs to change positions from time to time while remaining at the work station. . . ." [Tr. 12].  Therefore, the ALJ found that plaintiff was not under a disability as defined by the Act.  The ALJ found plaintiff's activities of daily living to be inconsistent with his complaints of pain, and that he had a sporadic work history.  He found that although "diagnoses exist for the claimant's alleged impairments, the severity is not supported in the medical records. There are almost no objective tests or notations of symptoms in the medical records which support the claimant's alleged level of pain, fatigue and incapacity." [Tr. 13].

Plaintiff contends that the ALJ erred in his RFC determination.  Specifically, he contends that the ALJ arbitrarily determined an RFC that was not based on all the medical evidence and did not adequately explain the basis of his determination.  Plaintiff argues that the ALJ provided no weight to the opinion of Dr. Nutik, without adequate reasons for rejecting his opinion.  He also asserts that it is not clear what opinions from Dr. Watermeier the ALJ included in his ultimate RFC, although he indicated he provided "some weight" to that opinion and to that of Dr. Jeffcoat, who was a non-examining government agency doctor. [Tr. 14-15].  Plaintiff contends that even though plaintiff only saw Dr. Nutik two times, he was a treating, examining physician because he provided two independent evaluations, and his opinion was relied upon by Dr. Watermeier.  Plaintiff asserts both doctors were treating physicians, and their opinions were entitled to controlling weight.  He also asserts that the opinion of Dr. Clarke, who performed a consultative examination for purposes of determining Medicaid eligibility, supports his position that his back condition has not improved.

A review of the medical records in this case indicates that plaintiff injured his back in a

car accident in April of 2000, when he was rear-ended. After the accident, plaintiff had x-rays and was sent to occupational medicine. He reported to Dr. Nutik, an orthopedic surgeon, in February of 2001, that he had low back and neck pain after the accident. He had previously had a fusion in his neck in 1996. Plaintiff told Dr. Nutik, who was performing an independent medical examination, that he had an MRI, and was told his neck was fine. He still had some popping when he turned his head. Plaintiff advised Dr. Nutik that based on the findings of an MRI and an EMG, he was told there was nerve damage in his low back. He was advised that he would have to have a disc removed. Plaintiff was waiting for surgery the first time he saw Dr. Nutik. He had undergone physical therapy, which made his pain worse. He was also on Vicodin and Soma. Plaintiff reported to the doctor that he had not returned to work since the car accident. He told the doctor about severe back pain, including pain on bending, turning his body, or stepping down. He stated that he could not do any kind of activity. After a full examination, Dr. Nutik found that plaintiff had a disc herniation at the sacral level, was not capable of returning to his prior work, and that he would be limited to sedentary activity, based on the present findings. Plaintiff continued to seek medical treatment for back pain. In July of 2001, he had lumbar fusion surgery. This was described by the operating surgeon as a ["p]artial laminotomy with partial fasciectomy, foraminotomy, excision of disc L5-S1, hemilaminotomy and partial decompression L4-5, posterolateral arthrodesis, lateral transverse process technique L4-5, L5-S1, with allograft and local bone graft." [Tr. 227]. The diagnosis at that time was degenerative disc disease and lumbar disc displacement. While he initially felt better after the surgery, by December of that year, he was complaining of pain in his calves, buttock and thigh. He had less than 50% range of motion in the lumbar spine. According to medical records through 2002, plaintiff continued to complain of right-side low back pain; and neck pain, low

back pain, and leg pain. He continued to have limited range of motion and MRIs that showed disc dessication, and spurring consistent with cervical spondylosis. In 2003, plaintiff was treated for neck and low back pain and his disability status was rated as total temporary in January.

Dr. Nutik provided a four-page report in November of 2003, after his second independent medical examination of plaintiff. He opined, after reviewing numerous diagnostic tests and examining plaintiff, that he had an apparent failure of fusion "based on the plain x-rays taken today and the CAT scan of the lumbar spine. . . .[Tr. 256]. He felt that he had a "poor prognosis for return to his previous physical status and he would be limited to a sedentary level of activity." [Id.]. He noted that additional surgery had been recommended to perform anterior lumbar fusion using cages, and stated that he would not be able to guarantee any functional improvement, even with surgery. He opined that plaintiff had reached a plateau regarding his low back pain. "He would be restricted to a sedentary level of activity and he would have to begin on a part-time basis only." [Id.]. The doctor also noted that plaintiff's use of medication [narcotic and muscle relaxers] could limit his ability to function in the work place.

The records also indicate that plaintiff went to a pain institute, where he was assessed with failed back syndrome with myofascial and radicular component and was recommended to start a series of epidural steroid injections. Additionally, there are medical records from 2009 from Dr. Garner, who prescribed narcotic pain medication for plaintiff's back pain, and from Dr. Clarke, an orthopedic surgeon who evaluated plaintiff for Medicaid.

Plaintiff saw Dr. Watermeier from 2000 until 2005. Dr. Watermeier observed that plaintiff had continuous back pain, tenderness, limited range of motion, moderate pain with straight leg raising, and assessed him with lumbar degenerative disc disease. He noted that his

pain was not relieved with conservative care and that additional surgery might be an option. He found that "prognosis is poor for a full recovery." [Tr. 246]. He acknowledged that plaintiff was not prepared for another surgery, but that if he were to become paralyzed, that would be "an absolute indication for surgery. . . ." [Id.]. A follow-up CT scan of the lumbar spine, performed for low back pain following back surgery, indicated that there was the possibility of bilateral laminectomy defect at L5-S1. The records indicate that plaintiff continued to complain to Dr. Watermeier about back pain, which the doctor identified as chronic and unchanging. He indicated that plaintiff had a total and permanent spinal disability, which would be the same, with or without surgery. In making his assessment, Dr. Watermeier noted that, in addition to treating plaintiff himself, he had reviewed a report from Dr. Nutik. He found that plaintiff had 10-15% disability of the lumbar spine. It was also his finding that plaintiff "needs to avoid repetitive stooping or bending and repetitive lifting of objects over 10-20 pounds. The patient needs to avoid prolonged sitting or standing in the same position for 45 minutes, plus/minus 15 minutes without being able to move around and change position." [Tr. 258]. He concluded that his work status would be limited to light work.

      Turning first to the weight given to the opinion of the treating physician, while a treating physician's opinions are ordinarily to be given substantial weight, they must be supported by medically acceptable clinical or diagnostic data, and must be consistent with substantial evidence in the record. Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999); Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004). The ALJ may reject the opinion of any medical expert if it is inconsistent with the medical record as a whole. See Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995). In Prosch v. Apfel, 201 F.3d 1010 (8th Cir. 2000), the Eighth Circuit Court of Appeals discussed the weight to be given to the opinions of treating physicians, holding that the

opinion of a treating physician is accorded special deference under the Social Security regulations.

Specifically regarding the opinion rendered by Dr. Nutik, the ALJ considered his assessments, but found that, while consistent with the record of the time given, plaintiff's condition has improved since then. He did not address whether he viewed the doctor's opinion as being that of a treating physician, but stated that he considered it and found it to lack value and relevance because there were more recent medical consultative examinations. The ALJ also stated that he took the opinion of Dr. Watermeier into consideration, found it to be generally consistent with the record at the time, and gave it some weight as a treating physician. The ALJ also commented on the opinion of a state medical consultant, Dr. Jeffcoat, who completed a physical RFC assessment. While noting that the doctor was not a treating physician, did not examine plaintiff, and that his assessment was likely based on an incomplete record, the ALJ gave Dr. Jeffcoat's opinion some weight. According to a vocational examiner who completed a vocational analysis worksheet, plaintiff could perform his past relevant work as dispatcher, according to her RFC. The ALJ stated that the examiner was a non-physician and that her opinion was not based on medical evidence, and therefore, her opinion was entitled to no medical evidentiary weight. He accepted her opinion as that from an "other source," and stated that "it had been appropriately considered." [Tr. 15]. The ALJ proceeded to find that plaintiff could perform his past relevant work as a dispatcher, as actually performed and as generally performed.

The Court has carefully reviewed the ALJ's assessment of the medical opinions in the record. The ALJ did not indicate how much weight he gave to the opinion of Dr. Watermeier, other than to indicate he gave his opinion some weight. He indicated he gave no weight to the

opinion of Dr. Nutik. The ALJ reached the conclusion, without apparently considering the medical evidence of record, that plaintiff's condition had improved over time. That does not appear to be the case. The Court finds, based on the record as a whole, that there is not substantial evidence to support the ALJ's decision regarding the weight he gave to the opinions of Drs. Nutik and Watermeier.

In this case, the ALJ discounted the opinion of Dr. Nutik on the basis that plaintiff's condition had improved and there were more recent medical consultative examinations. Initially, the Court would note that a careful review of the entire record lends credence to plaintiff's argument that his condition has not improved. For example, Dr. Watermeier opined, in 2004, that plaintiff's chronic pain was unchanging; in his last examination in 2005, he stated that plaintiff was stable, but that his prognosis was poor for a full recovery. The limitations he included were that plaintiff needed to avoid prolonged sitting or standing in the same position for 45 minutes, plus or minus 15 minutes, without being able to move around and change positions. Even the ALJ noted that he was under a doctor's care in 2009 and 2010 for back pain and was again being prescribed narcotic pain medication. He referenced the opinion of Dr. Clarke, who saw plaintiff in 2009, but mentioned only the doctor's finding that his neck exam was within normal limits. The ALJ did not mention that Dr. Clarke, an orthopedic surgeon, noted the likely failed spinal fusion, the decreased range of motion, and plaintiff's walking in a guarded manner. The ALJ also did not mention the treatment by Dr. Garner in 2009, where he observed decreased range of motion, assessed plaintiff with chronic back pain, and prescribed narcotic pain medication for pain management. Although Dr. Nutik saw plaintiff only twice, in 2001 and 2003, it is clear that he fully reviewed his medical records, conducted a thorough examination, and performed myriad diagnostic tests. His opinion in 2003 was based on medical records from

2001, including the fact that plaintiff had undergone spinal fusion surgery, which had ultimately failed. Additionally, there is no question that Dr. Watermeier, as he himself noted, relied on Dr. Nutik's opinion when he assessed plaintiff's condition. The ALJ stated that he gave some weight to Dr. Watermeier's opinion, but his RFC finding did not include Dr. Watermeier's opinion about plaintiff 's functional restrictions. While the ALJ noted several reasons not to credit Dr. Jeffcoat's opinion, he inexplicably gave that opinion some weight. Without adopting the RFC findings of the vocational examiner, he accepted her opinion as an "other source" in concluding that plaintiff could perform his past relevant work as a dispatcher.

After careful review, and given the fact that the totality of the record supports the conclusions of Dr. Nutik and Dr. Watermeier regarding plaintiff's physical limitations, the Court finds that the ALJ erred in the lack of weight afforded to their opinions. It is apparent that the record supports a finding that plaintiff has marked restrictions, which would impede his ability to maintain gainful employment. The Court finds that the ALJ did not give legally adequate reasons for the decision not to rely on the medically supported assessment of the degree of plaintiff's limitations by the treating physicians. Under the Social Security regulations, the opinion of a treating physician is accorded special deference, and the ALJ may only discount or disregard that opinion where there is better or more thorough medical evidence, or where a treating physician's opinion is so inconsistent that it undermines the credibility of such opinions. After reviewing the record as a whole, the Court finds that there was not substantial evidence to conclude that the opinions of the treating physicians were inconsistent with plaintiff's treatment records, otherwise inconsistent with other medical evidence of record, or inconsistent with the testimony adduced at the hearing. The ALJ erred in not giving appropriate weight these opinions.

Specifically regarding the RFC finding, an ALJ must determine the RFC, based on the medical evidence regarding the claimant's ability to function in the workplace. Stormo v. Barnhart, 377 F.3d 801, 807 (8th Cir. 2004). The ALJ should also consider "'all the evidence in the record' in determining the RFC, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Id. at 807 (quoting Krogmeier v. Barnhart, 294 F.3d 1019 (8th Cir. 2002). The plaintiff has the burden of producing documents to support his claimed RFC. Cox v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998)). The ALJ, however, has the primary responsibility for making the RFC determination, and the Court is required to affirm that determination if it is supported by substantial evidence in the record as a whole. McKinney v. Apfel, 228 F.3d 860, 862 (8th Cir. 2000).

In this case, regarding the ALJ's RFC finding, the Court finds that the ALJ erred in concluding that plaintiff could perform even sedentary work, which requires sitting up to six hours in an eight-hour day, and standing and/or walking two hours in an eight hour day. Based on the opinion of treating physician Dr. Watermeier, plaintiff could not sit or stand more than 45 minutes, plus or minus 15 minutes, without having to walk around and change positions. The Court finds that the RFC determination is flawed because the ALJ did not consider the restrictions imposed by Dr. Watermeier in terms of plaintiff being limited to sitting or standing for 45 minus, plus or minus 15 minutes, with the ability to move around and change positions. His limitation was that plaintiff "needs to change positions from time to time while remaining at the work station." [Tr. 12-13]. Based on a full review of the medical records, and for the reasons delineated herein, the Court finds that there is not substantial evidence in the record as a whole to support the ALJ's RFC determination.

Based on the record before it, the Court finds that the ALJ's decision that plaintiff is not

disabled and could perform his past relevant work as a dispatcher is not supported by substantial evidence in the record. Accordingly, the decision of the Secretary should be reversed.

It is hereby

ORDERED that plaintiff's motion for judgment on the pleadings be, and it is hereby, granted. It is further

ORDERED that, pursuant to 42 U.S.C. Section 405(g), this matter be remanded to the Commissioner for the calculation and award of benefits.

/s/ James C. England<br>JAMES C. ENGLAND<br>United States Magistrate Judge

Date: March 19, 2012